## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

JOHN KONOP, derivatively on behalf of YAYYO, INC.,

    Plaintiff,

    vs.

RAMY EL-BATRAWI, JONATHAN ROSEN, KEVIN PICKARD, JEFFREY J. GUZY, CHRISTOPHER MIGLINO, DOUGLAS M. MOX, JOHN P. O'NEILL, PAUL RICHTER, STEPHEN M. SANCHEZ, and HARBANT S. SIDHU,

    Defendants,

    and

YAYYO, INC.,

    Nominal Defendant.

C.A. No. _____

**DEMAND FOR JURY TRIAL**

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff John Konop ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant YayYo, Inc. ("YayYo" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Ramy El-Batrawi, Jonathan Rosen, Kevin Pickard, Jeffrey J. Guzy, Christopher Miglino, Douglas M. Mox, John P. O'Neill, Paul Richter, Stephen M. Sanchez, and Harbant S. Sidhu (collectively, the "Individual Defendants," and together with YayYo, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of YayYo, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for contribution under Section 11(f) of the Securities Act of 1933

1

(the "Securities Act") and Section 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding YayYo, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by YayYo's current and/or former directors and officers from November 14, 2019 through the present (the "Relevant Period") based on misleading statements and omissions made in connection with the Company's November 2019 initial public offering of stock ("the IPO"), and subsequent failures to correct them.

2.      Through its subsidiaries, YayYo operates a proprietary peer-to-peer booking platform that rents standard passenger vehicles to self-employed ridesharing drivers.  The Company's platform launched and currently operates in Los Angeles, California, though YayYo intends to expand its platform to additional markets.

3.      Prior to founding YayYo, Defendant Ramy El-Batrawi ("El-Batrawi") was the principal stockholder, Chairman, and CEO of GenesisIntermedia, Inc. ("Genesis"), a now-defunct public company that, like YayYo, was also incorporated in Delaware and based in California. Genesis operated a consumer telemarketing company, shopping mall kiosks, and a car rental

company.  However, on April 13, 2006, the SEC announced that it had commenced an enforcement action against Defendant El-Batrawi, along with other officers, directors, and associates of Genesis.[1]  In the complaint, the SEC charged Defendant El-Batrawi with violations of Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act in connection with a scheme to manipulate the stock price of Genesis. The SEC asserted that Defendant El-Batrawi improperly raised approximately $130 million through lending Genesis shares, rather than selling them, and charged him with systematically engaging in fraudulent and deceptive practices that had the effect of generating additional cash proceeds from broker-dealers that had participated in certain stock loan transactions. Moreover, the SEC complaint detailed that Defendant El-Batrawi was secretly compensating a well-known financial commentator to tout Genesis on television to drum up demand for Genesis stock.

4.      Thereafter, on April 1, 2010, Defendant El-Batrawi entered into a final judgment by consent and settled the SEC's enforcement action.  Accordingly, the U.S. District Court for the Central District of California entered a consent decree against Defendant El-Batrawi, that, among other things, prohibited Defendant El-Batrawi from serving as an officer or director to a public company within five-years from April 1, 2010.  Further, on April 5, 2010, the SEC revoked the registration of each class of Genesis' securities.

5.      Shortly after YayYo's launch, it quickly became apparent that YayYo would need additional funding to continue its operations.  As an illustration, on November 29, 2016, the Company entered into the Davis Employment Agreement (defined below) with the Company's now-former Chief Executive Officer ("CEO"), President, and director, Anthony Davis ("Davis") at which time Davis was appointed as CEO.  However, because the Company could not afford to

---

[1] *SEC v. El-Batrawi, et al.*, Case No. 2:06-cv-02247-MRP-RZ (C.D. Cal. 2006).

pay an experienced CEO's salary, YayYo offered Davis stock options in lieu of a market-rate salary.

6.      Moreover, between July 2018 and July 2019, the Company engaged Social Reality, Inc., which changed its name to "SRAX, Inc." in August 2019 ("SRAX"), for advertising and marketing services.  However, because the Company was unable to pay SRAX for its services, the Company accrued a debt of approximately $426,286, a large portion of which remained outstanding at the time of the IPO.

7.      Strapped for cash, the Company's management began acting on plans to take the Company public in or around April 2018.  On April 30, 2018, before the beginning of the Relevant Period, the Company filed a registration statement on Form S-1 with the SEC (the "Registration Statement") in connection with the planned IPO.  The Registration Statement stated that 1,500,000 shares would be registered in the IPO, at a proposed maximum offering price per share of $4.00. Thereafter, the Company filed fifteen amendments to the Registration Statement on Form S-1/A with the SEC.  The Registration Statement was declared effective on November 12, 2019, and the Company's stock began trading publicly on the Nasdaq the next day, on November 13, 2019.

8.      Subsequently, on November 14, 2019, the Company filed with the SEC a Prospectus on Form 424B4 (the "First Prospectus") in connection with the IPO.  Thereafter, on November 18, 2019, the Company filed with the SEC another Prospectus on Form 424B4 (the "Second Prospectus").  The First Prospectus and the Second Prospectus formed part of and were incorporated into the Registration Statement.  The First Prospectus, the Second Prospectus, the Registration Statement, and all amendments thereto are collectively referred to herein as the "Offering Documents."  The IPO closed on November 15, 2019, with the Company having sold 2,625,000 shares of Company stock to the public at $4 per share.  Through the IPO, YayYo

received aggregate gross proceeds of approximately $10.5 million, before deducting underwriter costs and expenses.

9.      However, due to YayYo's founder's checkered past, the process of turning public was arduous and transformative for YayYo.  Specifically, Nasdaq had conditioned its approval of YayYo's common stock listing on Defendant El-Batrawi relinquishing his ownership and control of the Company—including by resigning from all of his positions with YayYo and retaining less than a 10% ownership interest in the Company.

10.     The Company appeared to acquiesce to Nasdaq's conditions, and accordingly, the Offering Documents declared that: (i) Defendant El-Batrawi resigned from all positions with the Company; (ii) through X, LLC, an entity that was wholly owned and controlled by Defendant El-Batrawi, Defendant El-Batrawi reduced his beneficial ownership of YayYo's common stock to 9.9%; and (iii) Defendant El-Batrawi entered into a Voting Trust Agreement in which he relinquished control of his remaining voting power to a trustee.  The Offering Documents also provided that the Company intended to use the net proceeds from the IPO to expand YayYo's fleet of passenger vehicles and for general corporate purposes.  Further, the Offering Documents stated that Davis had failed to exercise his stock options that expired on December 31, 2018 and also that the Company incurred expenses and had accrued an outstanding balance as of December 31, 2018 in connection to online media services provided by SRAX to YayYo.

11.     However, these statements were misrepresentative and omitted certain crucial details—namely, that Defendant El-Batrawi violated the conditions imposed by the Nasdaq, since he remained in a position of supervision, authority, and control over the Company and was closely participating with YayYo's business operations on a daily basis, and failed to reduce his equity ownership interest in the Company to below 10%.  Further, the statements above failed to disclose

that certain debts that the Company had accrued in connection to its transactions with Davis and SRAX remained outstanding at the time of the IPO.  Finally, the Offering Documents omitted that in exchange for certain creditors agreeing to purchase Company shares in the IPO, the Individual Defendants had pledged to use some of the proceeds from the IPO to repurchase Company shares from those creditors following the completion of the IPO.

12.     Importantly, the Individual Defendants failed to issue statements correcting the above-referenced material misstatements and omissions in the Offering Documents.  Instead, many of the false and misleading statements contained in the Offering Documents were reiterated in the Company's annual report on Form 10-K for the fiscal year ended December 31, 2019 (the "2019 10-K"), which was filed with the SEC months after the closing of the IPO.

13.     On January 24, 2020, then-CEO Jonathan Rosen ("Rosen"), caused the Company to commence a lawsuit against Defendant El-Batrawi seeking a declaratory judgment and permanent injunction (the "El-Batrawi Lawsuit"),[2] alleging that since his supposed resignation from the Company, Defendant El- Batrawi had been, on behalf of the Company, contacting competitors, suppliers, and vendors of the Company, as well as meeting with financiers and investment firms. Further, according to the El-Batrawi Lawsuit, Defendant El-Batrawi hired a public relations firm on behalf of the Company, produced and aired commercials for the Company on *Fox Business Channel*, attempted to hire two marketing firms for the Company, and dictated certain changes to the Company's website. In addition, the complaint asserted that Defendant El-Batrawi's interference had disrupted and harmed the Company's business.

---

[2] *YayYo, Inc. v. El-Batrawi*, Case No. 20STCP00309 (Super. Ct. Los Angeles County), filed January 24, 2020.

14.     Two days later, on January 26, 2020, Defendant Rosen resigned from his position as CEO for "Good Reason" in accordance his employment agreement.[3]

15.     Approximately two weeks later, on February 10, 2020, the Company issued a press release (the "February 2020 Press Release") announcing that the Company's Board of Directors (the "Board") had elected to voluntarily delist the Company's stock from the Nasdaq, effective February 20, 2020.

16.     The next day, on February 11, 2020, SRAX commenced a lawsuit against the Company seeking to collect on a debt owed to it by YayYo for media services rendered prior to the IPO (the "SRAX Lawsuit").[4]

17.     On March 3, 2020, with the Company's common stock delisted from the Nasdaq and Defendant Rosen no longer at the helm, the Company filed a current report with the SEC on Form 8-K (the "March 2020 8-K") announcing that Defendant El-Batrawi had been appointed CEO, effective immediately.

18.     Two days later, on March 5, 2020, Davis commenced an action against the Company seeking, among other things, damages for breach of contract (the "Davis Lawsuit"),[5] alleging that YayYo owed Davis over $454,086 for losses related to compensation—namely, his stock options.

---

[3] For the purposes of Defendant Rosen's employment agreement dated January 10, 2020, the term "Good Reason" means upon the occurrence of, among other things, "any material change in [Defendant Rosen's] position or responsibilities, excluding for this purpose an isolated, insubstantial and inadvertent action not taken in bad faith that is remedied by the Company promptly after notice thereof is given by [Defendant Rosen]."

[4] *Social Reality, Inc. v. YayYo, Inc*, Case No. 20STCV05559 (Super. Ct. Los Angeles County), filed February 11, 2020.

[5] *Davis. v. YayYo, Inc*, Case No. 20STCV09143 (Super. Ct. Los Angeles County), filed March 5, 2020.

19.     On April 13, 2020, YayYo filed a current report with the SEC on Form 8-K (the "April 2020 8-K") announcing that X, LLC, a company that was wholly-owned and controlled by Defendant El-Batrawi, had loaned approximately $150,000 to YayYo, secured by all of the Company's assets under the terms of an oral agreement.

20.     On April 28, 2020, FirstFire Global Opportunities Fund, LLC ("FirstFire") commenced an action against, among other parties, WestPark Capital, Inc. ("WestPark") and Aegis Capital Corporation ("Aegis," and together with WestPark, the "Underwriters") arising out of their roles as underwriters in the IPO (the "FirstFire Lawsuit").[6]  In addition to other fraudulent misconduct committed by Defendant El-Batrawi, the FirstFire Lawsuit revealed that the Offering Documents were materially false and misleading since they omitted that Defendant El-Batrawi maintained continuous control over YayYo leading up to the IPO.

21.     On the foregoing disclosures, the price of the Company's stock dropped by an astonishing 97.5%, or $3.90, tumbling from $4.00 per share at the time of the IPO to $0.10 per share at the close of trading on April 28, 2020.

22.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and misleading statements regarding the Company's business, operations, and prospects.  Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) in violation of the listing conditions imposed by the Nasdaq, Defendant El-Batrawi failed to discontinue his supervision, authority, and control over the Company, and was closely involved on a daily basis with YayYo's

---

[6] *FirstFire Global Opportunities Fund, LLC v. WestPark Capital, Inc., et al.*, Case No. 1:20-cv-03327-LLS (S.D.N.Y. 2020).

business, operations and finances, including contributing to the marketing of YayYo's IPO; (2) in further violation of the listing conditions imposed by the Nasdaq, Defendant El-Batrawi did not properly divest himself of the 12,525,000 "Private Shares" of Company stock he owned, and continued to hold a controlling interest in the Company; (3) to meet the Nasdaq's minimum listing requirements, the Individual Defendants pledged that in exchange for certain of the Company's creditors agreeing to purchase shares in the IPO, the Company would repurchase those shares with the proceeds the Company received from the IPO; (4) the Company owed Davis approximately $454,086 at the time of the IPO; (5) the Company owed SRAX approximately $426,286 in unpaid media services, most of which was over one year past due; and (6) as a result, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

23.     As a result of the foregoing, the Company's public statements were materially false and misleading.

24.     After the IPO, the Individual Defendants failed to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

25.     Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

26.     In light of the Individual Defendants' misconduct, which has subjected the Company, its CEO, its former CEO, its former Chief Financial Officer ("CFO"), five members of its Board of Directors (the "Board"), five former members of the Board, and the underwriters of the IPO to two state securities class action lawsuits pending in the Superior Court of the State of California (the "State Securities Class Actions"), and to two federal securities fraud class action

lawsuits pending in the United States District Court for the Central District of California (the "Federal Securities Class Actions," and together with the State Class Actions, the "Securities Class Actions"), the need to undertake internal investigations, the need to implement adequate internal controls, the losses from the waste of corporate assets, and the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

27.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, some of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and in the Securities Class Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

28.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

29.    Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions.

30.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

31.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

32.     Venue is proper in this District because YayYo is incorporated in this District. In addition, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

33.     Plaintiff is a current shareholder of YayYo.  Plaintiff has continuously held YayYo common stock since before the IPO.

### Nominal Defendant YayYo

34.     YayYo is a Delaware corporation with its principal executive offices at 433 N. Camden Drive, Suite 600, Beverley Hills, California 90210. YayYo's shares trade on The OTC Markets Group Inc.'s Pink Open Market ("OTC Pink") under the ticker symbol "YAYO."

### Defendant El-Batrawi

35.     Defendant El-Batrawi is the founder of YayYo and has served as YayYo's CEO and as a Company director since February 28, 2020.  He previously served as CEO from the Company's inception until about November 2016, and again from about May 2017 until he resigned on October 4, 2018. Defendant El-Batrawi also served as Acting CEO from November 17, 2018 until he purportedly resigned on February 1, 2019.[7]  He also previously served as a Company director from June 2016 until his purported resignation in September 2019.  According to the 2019 10-K, as of March 27, 2020, Defendant El-Batrawi beneficially owned 2,900,000

---

[7] On February 1, 2019, Defendant El-Batrawi entered into a Consulting Agreement with the Company pursuant to which he would assist the Company's CEO with the management of the Company.

shares of the Company's common stock, which represented 9.9% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on March 27, 2020 was $0.17, Defendant El-Batrawi owned approximately $493,000 worth of YayYo stock.

36. For the fiscal year ended December 31, 2019, Defendant El-Batrawi received $167,000 in compensation from the Company, which consisted entirely of salary. For the fiscal year ended December 31, 2018, Defendant El-Batrawi received $205,000 in compensation from the Company, which consisted entirely of salary.

37. The Company's website stated the following about Defendant El-Batrawi:[8]

Mr. El-Batrawi is the original founder of YayYo and served as its CEO until February 2019. He is a highly accomplished entrepreneur with over three decades of experience leading high-growth companies. El-Batrawi is also the founder of X, LLC, a private investment firm focused on acquiring companies and implementing effective growth strategies. Over his extensive career, he has founded several other notable companies.

**Defendant Rosen**

38. Defendant Rosen purportedly served as the Company's CEO from February 2019 until he resigned on January 26, 2020.

39. For the fiscal year ended December 31, 2019, Defendant Rosen received $300,000 in compensation from the Company. This included $275,000 in salary and $25,000 in bonus.

40. The Second Prospectus stated the following about Defendant Rosen:

*Jonathan Rosen, Chief Executive Officer*. Mr. Rosen is the Chief Executive Officer of the Company. Mr. Rosen has more than 25 years' experience serving as an executive driving revenue, operations and marketing for leading public and private companies. For the past 15 years, Mr. Rosen has focused on automotive, software and media markets at both successful startups and global companies. He held the founding Chief Marketing and Chief Revenue Officer positions at Involvesoft, a leading SaaS software company (2017-2018), where he was brought in by the

---

[8] https://yayyo.com/management/#1578335705254-7d26b6e0-7c4c. Last visited October 2, 2020.

company's venture bankers to launch the entity and raise capital. Mr. Rosen held multiple interim executive and advisory positions to numerous early-stage companies similar to YayYo. His experience over the last five years includes interim executive or consulting roles at WeWork (2017-2018), Beachbody (2015-2016), Ziff Davis/J2 Equities (2015), iInside and Opus Research (2014-2015) and others. Prior to that he held executive roles at companies including Autobytel, Webvisible, and America Online. At AOL, he served as the Executive Director of Strategy, where he shepherded high-value acquisitions and partnerships including Advertising.com; and architected their first traffic acquisition programs. Rosen served as Senior Vice President for Autobytel – one of the largest automotive search and online properties where he led business development, ad networks and advertising sales and operations. Early in his career, Mr. Rosen held senior management roles in the computer storage industry and was the founding President of iProspect; now the world's largest search marketing agency and a subsidiary of Dentsu.

### **Defendant Pickard**

41.     Defendant Kevin F. Pickard ("Pickard") served as the Company's CFO, secretary, and as a Company director from October 2017 until he resigned on April 3, 2020.  According to the 2019 10-K, as of March 27, 2020, Defendant Pickard beneficially owned 300,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 27, 2020 was $0.17, Defendant Pickard owned approximately $51,000 worth of YayYo stock.

42.     For the fiscal year ended December 31, 2019, Defendant Pickard received $125,000 in compensation from the Company, which consisted entirely of salary. For the fiscal year ended December 31, 2018, Defendant Pickard received $970,468 in compensation from the Company. This included $66,000 salary and $904,468 in option awards.

43.     The 2019 10-K stated the following about Defendant Pickard:

**Kevin F. Pickard** is the Company's Chief Financial Officer, Director, and Secretary since October 2017. Since 2000, Mr. Pickard has been providing management consulting services through Pickard & Company, CPAs to small and medium-sized companies, included due diligence on potential acquisitions, the preparation of projections and business plans, assistance with restructuring of companies, posturing companies for initial public offerings, review and preparation

13

of filings with the Securities and Exchange Commission. Prior to 2000, Mr. Pickard was a partner of Singer Lewak Greenbaum & Goldstein, LLP, Los Angeles, California, where he co-managed the accounting its securities industry practice group. Mr. Pickard also worked at PricewaterhouseCoopers, LLP (formerly, Coopers & Lybrand, LLP) where he focused on auditing companies in insurance, high-tech and industries. Mr. Pickard holds a Bachelor's of Science in Accounting and a Master of Accountancy from Brigham Young University. Mr. Pickard is currently a licensed Certified Public Accountant in North Carolina, and California. Mr. Pickard's experience in accounting and finance qualify him for a position on our board of directors.

**Defendant Guzy**

44.   Defendant Jeffrey J. Guzy ("Guzy") served as a Company director from October 2017 until he was removed on January 22, 2020. He also served as a member of the Audit Committee.

45.   For the fiscal year ended December 31, 2019, Defendant Guzy received $10,000 in compensation from the Company, which consisted entirely of fees earned or paid in cash.

46.   The Second Prospectus stated the following about Defendant Guzy:

*Jeffrey J. Guzy, Director*. Mr. Guzy serves as a business development consultant and entrepreneur in Arlington, Virginia. Mr. Guzy is currently working with CoJax Oil and Gas Corporation and PrecyseTech. Prior to that, Mr. Guzy served, from October 2007 to August 2010 as the President of Leatt Corp. and has remained a director of that public company since April 2007. Mr. Guzy has an MBA in Strategic Planning and Management from The Wharton School of the University of Pennsylvania; a M.S. in Systems Engineering from the University of Pennsylvania; a B.S. in Electrical Engineering from Penn State University; and a Certificate in Theology from Georgetown University. Mr. Guzy has served as an executive manager or consultant for business development, sales, customer service and management in the telecommunications industry, specifically, with IBM Corp., Sprint International, Bell Atlantic Video Services, Loral CyberStar and FaciliCom International. Mr. Guzy has also started his own telecommunications company providing Internet services in Western Africa. He serves as an independent director and chairman of the audit committee of Capstone Companies, Inc., a public corporation. Mr. Guzy's financial background, as well as his ability to serve as our audit committee financial expert, qualifies him to serve as a member of our board of directors.

**Defendant Miglino**

47.     Defendant Christopher Miglino ("Miglino") served as a Company director from October 2017 until he was removed on January 22, 2020.  He also served as a member of the Compensation Committee.  Defendant Miglino also serves as the CEO and Chairman of SRAX.

48.     The Second Prospectus stated the following about Defendant Miglino:

*Christopher Miglino, Director*. Mr. Miglino serves as a director of the Company. Mr. Miglino has long been at the nexus of consumers, brands, social and lifestyle media, cause marketing and the enlightened, sustainable business movement. Mr. Miglino is the founder and CEO of Social Reality. Since 2010, Mr. Miglino has served as the Chief Executive Officer of Social Reality. Prior to founding Social Reality, Mr. Miglino served as the Chief Executive Officer of Lime Ad Network, a vanguard in the green and sustainable online business arena that connected consumers and brands with a collection of more than 250 green and socially conscious businesses. From June 2004 until August 2008, Mr. Miglino was CEO of Conscious Enlightenment, where he oversaw their day to day operations in the publishing and advertising industry. From 2004 until 2008, Mr. Miglino served as a board member for Golden Bridge Yoga in Los Angeles, a studio that encompasses over 20,000 square feet of yoga spaces including a restaurant. Mr. Miglino's extensive knowledge of marketing, advertising and social media make him valuable as a member of our board of directors.

**Defendant Mox**

49.     Defendant Douglas M. Mox ("Mox") has served as a Company director since January 2020.  He also serves as the Chairman of the Audit Committee.

50.     The 2019 10-K stated the following about Defendant Mox:

**Douglas M. Mox** has been our Director since January 2020. Mr. Mox, 53, has extensive experience in financial management and strategic planning, as well as logistics, engineering and operations. Since January 2013, Mr. Mox has been the Chief Operating Officer of Grace Thomas Investment, a private equity firm. Prior thereto, Mr. Mox, who has a B.S. degree in aviation management/logistics, worked as a senior manager at DHL Worldwide Express, an affiliate of DHL International GmbH, and as an industrial engineering manager for United Parcel Service. The Company believes that Mr. Mox is is qualified to serve as a director of the Company as a result of his financial expertise and his extensive experience in the private equity and logistics industries.

**Defendant O'Neill**

51.     Defendant John P. O'Neill ("O'Neill") has served as a Company director since

January 2020. He also serves as a member of the Audit Committee.

52.     The 2019 10-K stated the following about Defendant O'Neill:

**John P. O'Neill** has been our Director since January 2020. Mr. O'Neill, 62, is a 45-year veteran of the logistics industry and has worked both in the U.S. and internationally over the course of his career. Since 1990, Mr. O'Neill has been employed by affiliates of DHL International GmbH in positions of increasing responsibility in the U.S. and throughout Asia. Since March 2013, Mr. O'Neill has been the Deputy Managing Director of DHL-Sinotrans International Air Courier, in Beijing. The Company believes that Mr. O'Neill is qualified to serve as a director of the Company as a result of his extensive leadership experience in the logistics industry.

**Defendant Richter**

53.     Defendant Paul Richter ("Richter") served as a Company director from July 2019 until he was removed on January 22, 2020.  He also served as a member of the Audit Committee. He also previously served as a Company director from October 2017 until November 17, 2018.

54.     For the fiscal year ended December 31, 2019, Defendant Richter received $10,000 in compensation from the Company, which consisted entirely of fees earned or paid in cash.

55.     The Second Prospectus stated the following about Defendant Richter:

*Paul Richter, Director.* Mr. Richter is a member of the board of directors of the Company since July 2019. In addition, he previously served as a director of the Company from October 2017 to November 2018. Since 1986, Mr. Richter, a licensed attorney, has performed legal services in the areas of securities and corporate law representing public and private companies in the U.S. Mr. Richter's legal practice focuses predominantly on SEC/state securities law compliance (including public and private securities offerings and SEC filings); corporate governance law compliance; contracts; commercial transactions; regulatory dispute resolution; business start-up formation and funding; employee-employer dispute resolution; corporate compensation plans; business immigration; and compliance with FINRA, Nasdaq and The OTC Markets Group, Inc. rules and regulations. In addition, Mr. Richter has experience in cross-border transactional matters having performed U.S. legal work for companies based in Hong Kong, India, Poland, Norway, Canada, United Kingdom and U.A.E. Mr. Richter is a licensed attorney with the state bar of Virginia.

**Defendant Sanchez**

56.     Defendant Stephen M. Sanchez ("Sanchez") has served as Chairman of the Board

since January 2020.  He also serves as Chairman of the Compensation Committee. According to the 2019 10-K, as of March 27, 2020, Defendant Sanchez beneficially owned 1,014 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 27, 2020 was $0.17, Defendant Sanchez owned approximately $172 worth of YayYo stock.

57.     The 2019 10-K stated the following about Defendant Sanchez:

**Stephen M. Sanchez** has been our Director since January 2020. Mr. Sanchez has over 30 years of experience in the logistics industry, particularly in the design, implementation and operation of last-mile delivery services. Since November 2019, Mr. Sanchez has served as the Chief Executive Officer of PDQ Pickup LLC, a moving and logistics company, or PDQ Pickup. From August 2019 until November 2019, Mr. Sanchez was the Chief Operating Officer of PDQ pickup. PDQ Pickup. From January 2018 until August 2019, Mr. Sanchez was Senior Vice President of Operations and Business Development for Boxbot, Inc., a robotics company focusing on the development and sale of autonomous last-mile delivery vehicles. From November 2015 until January 2018, Mr. Sanchez was Senior Manager of Final Mile Process Engineering for Amazon, Inc. From September 2014 until November 2015, Mr. Sanchez served as Vice President/Director of Supply Chain – Hub and Network Planning, for LaserShip Inc., a regional provider of same-day and next-day delivery services. Mr. Sanchez, who is a Veteran of the U.S. Navy, also has held positions of increasing responsibility with affiliates of DHL International GmbH, as well as with National Express Corporation and United Parcel Service. We believe that Mr. Sanchez is qualified to serve as a director of our company as a result of his extensive leadership experience in logistics and business development.

### **Defendant Sidhu**

58.     Defendant Harbant S. Sidhu ("Sidhu") has served as a Company director since October 2017. He also serves as a member of the Compensation Committee. He previously served as a member of the Audit Committee.

59.     The 2019 10-K stated the following about Defendant Sidhu:

**Harbant S. Sidhu** serves as a director of the Company. Mr. Sidhu is a design engineer and founder of Advanced Tek Group, Inc. (formerly Magnaspec, Inc.), a private aerospace manufacturing business. Since 2012, Mr. Sidhu has operated Advanced Tek Group, Inc., managing all aspects of the operating business. Mr. Sidhu has experience in personnel management and oversite, aerospace and defense

engineering, sales, manufacturing, accounting and operational experience in the aerospace and defense manufacturing industry. Mr. Sidhu has performed unclassified contracting work in components production for Mexico's Department of Defense. Mr. Sidhu graduated as an electrical engineer in 1980 from Punjab University, India. Mr. Sidhu's experience in human resources coupled with his business experience qualifies him to serve on our board of directors.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

60.     By reason of their positions as officers, directors, and/or fiduciaries of YayYo and because of their ability to control the business and corporate affairs of YayYo, the Individual Defendants owed YayYo and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage YayYo in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of YayYo and its shareholders so as to benefit all shareholders equally.

61.     Each director and officer of the Company owes to YayYo and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

62.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of YayYo, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

63.     To discharge their duties, the officers and directors of YayYo were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

64.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the

affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of YayYo, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised YayYo's Board at all relevant times.

65.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and trades on the OTC Pink, and which was traded on the Nasdaq, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

66.     To discharge their duties, the officers and directors of YayYo were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of YayYo were required to, among other things:

> (a)     ensure that the Company was operated in a diligent, honest, and prudent

manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to YayYo's own Code of Business Conduct and Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how YayYo conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of YayYo and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that YayYo's operations would comply with all applicable laws and YayYo's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

67.     Each of the Individual Defendants further owed to YayYo and the shareholders the duty of loyalty requiring that each favor YayYo's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

68.     At all times relevant hereto, the Individual Defendants were the agents of each other and of YayYo and were at all times acting within the course and scope of such agency.

69.     Because of their advisory, executive, managerial, and directorial positions with YayYo, each of the Individual Defendants had access to adverse, non-public information about the Company.

70.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by YayYo.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

71.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

72.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants'

violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, and future business prospects; and (iii) to artificially inflate the Company's stock price.

73.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of YayYo was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

74.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

75.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of YayYo and was at all times acting within the course and scope of such agency.

## **YAYYO'S CODE OF CONDUCT**

76.     The Company's Code of Business Conduct and Ethics (the "Code of Conduct") provides that "[w]e expect every employee, officer and director to read and understand this Code

and its application to the performance of his or her business responsibilities.  References in this Code to employees are intended to cover officers and, as applicable, directors."  The Code of Conduct also maintains that, "[i]t is the general policy of [YayYo] to conduct its business activities and transactions with the highest level of integrity and ethical standards and in accordance with all applicable laws."

77.   In a section titled, "Honest and Ethical Conduct," the Code of Conduct states, "[i]t is the policy of the Company to promote high standards of integrity by conducting our affairs in an honest and ethical manner."

78.   In a section titled, "Legal Compliance," the Code of Conduct states the following:

Obeying the law, both in letter and in spirit, is the foundation of this Code. Our success depends upon each employee's operating within legal guidelines and cooperating with local, national and international authorities. We expect employees to understand the legal and regulatory requirements applicable to their business units and areas of responsibility and to comply with the relevant laws, rules and regulations associated with their employment, including laws prohibiting insider trading (which are discussed in further detail below). While we do not expect you to memorize every detail of these laws, rules and regulations, we want you to be able to determine when to seek advice from others. If you do have a question in the area of legal compliance, it is important that you not hesitate to seek answers from your supervisor or the Chief Financial Officer.

79.   In a section titled, "Conflicts of Interest," the Code of Conduct states the following:

We respect the rights of our employees to manage their personal affairs and investments and do not wish to impinge on their personal lives. At the same time, employees should avoid conflicts of interest that occur when their personal interests may interfere or appear to interfere in any way with the performance of their duties or the best interests of the Company. A "conflict of interest" occurs when the private interest of an employee interferes in any way, or appears to interfere with the interests of the Company as a whole. Conflicts of interest also arise when an employee or a member of his or her family receives improper personal benefits as a result of his or her position with the Company. We expect our employees to be free from influences that conflict with the best interests of the Company or might deprive the Company of their undivided loyalty in business dealings. Even the appearance of a conflict of interest where none actually exists can be damaging and should be avoided. Whether or not a conflict of interest exists or will exist can be unclear.  Conflicts of interest are prohibited...

23

80.     In a section titled, "Corporate Opportunities," the Code of Conduct states the following:

> You may not take personal advantage of opportunities for the Company that are presented to you or discovered by you as a result of your position with us or through your use of corporate property or information, unless authorized by the Chief Financial Officer, in the case of employees, or the Audit Committee, in the case of a director or officer. Even opportunities that are acquired privately by you may be questionable if they are related to our existing or proposed lines of business. Participation in an investment or outside business opportunity that is directly related to our lines of business must be pre-approved. You may not use your position with the Company or our corporate property or information for improper personal gain, nor should you compete with us in any way.

81.     In a section titled, "Accuracy of Books and Records and Financial Reporting," the Code of Conduct states the following:

> The integrity of our records and public disclosure depends upon the validity, accuracy and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, creditors, employees and others with whom we do business.  As a result, it is important that our books, records and accounts accurately and fairly reflect, in reasonable detail, our assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities. We require that:
>
> 1. no entry be made in our books and records that intentionally hides or disguises the nature of any transaction or of any of our liabilities, or misclassifies any transactions as to accounts or accounting periods;
>
> 2. transactions be supported by appropriate documentation;
>
> 3. the terms of commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in our books and records;
>
> 4. employees comply with our system of internal controls; and
>
> 5. no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund.
>
> Employees who are responsible for accounting matters or contribute to or prepare the Company's financial statements, periodic reports filed with the Securities and

Exchange Commission (the "SEC") or other public disclosure documents or communications should ensure that our books, records and accounts are accurately maintained, be familiar with our disclosure controls and procedures and internal controls and take all necessary steps to ensure that all reports filed with or submitted to the SEC and all other public disclosure regarding our business provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. All employees are expected to cooperate fully with our independent auditors and persons performing an internal audit function.

82.     In a section titled, "Protection and Proper Use of Company Assets," the Code of

Conduct states the following, in relevant part:

All employees are expected to protect our assets and ensure their efficient use. Theft, carelessness and waste have a direct impact on our financial condition and results of operations. Our property, such as office supplies, computer equipment, products, laboratory supplies and office or laboratory space are expected to be used only for legitimate business purposes.

The obligation to protect the Company's assets includes the Company's proprietary information. Proprietary information includes intellectual property (such as trade secrets, patents and trademarks) as well as product development, scientific data, manufacturing, business and marketing plans, databases, records and any non-public financial data or reports.

Any misuse or suspected misuse of our assets must be immediately reported to your supervisor or the Chief Financial Officer.

83.     In a section titled, "Reporting Violations of the Code; Enforcement; Non-

Retaliation," the Code of Conduct states that "[i]f you become aware of a suspected or actual

violation of this Code, you must promptly report the matter. Failure to report a known violation

allows misconduct to go unremedied and is itself grounds for discipline."

84.     The section titled "Reporting Violations of the Code; Enforcement; Non-

Retaliation" further provides:

If any investigation indicates that a violation of this Code has probably occurred, we will take such action as we believe to be appropriate under the circumstances. If we determine that an employee is responsible for a Code violation, he or she will be subject to disciplinary action up to, and including, termination of employment and, in appropriate cases, civil legal action or referral for regulatory or criminal

prosecution.  Appropriate action may also be taken to deter any future Code violations.

85.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, and unjust enrichment, and aiding and abetting thereof.  Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

86.     YayYo is a California-based company founded by Defendant El-Batrawi in June 2016 under the name YayYo, LLC, which was quickly converted into a Delaware corporation later that year.  Initially, the Company operated as an exclusive provider of transportation network systems but, in August 2017, the Company turned its focus towards operating a diversified vehicle rental business along with a related transportation network system.

87.     YayYo touts itself as a proprietary, online peer-to-peer bookings platform that services the ridesharing economy and maintains a fleet of standard passenger vehicles that YayYo rents out to drivers of ridesharing platforms, such as Uber or Lyft.[9]  In addition to renting out Company-owned vehicles, YayYo offers standard passenger car owners an opportunity to monetize vehicles by renting them out to ridesharing economy drivers.  Although the Company

---

[9] Ridesharing platforms connect drivers with riders to facilitate the completion of a successful transportation service for riders.

intends to launch in additional markets, YayYo currently operates its platform in Los Angeles, California.

88.     Prior to founding YayYo, Defendant El-Batrawi was the principal stockholder, Chairman, and CEO of Genesis, a now-defunct public company which, like YayYo, was also incorporated in Delaware and based in California.  Genesis operated a consumer telemarketing company, shopping mall kiosks, and a car rental company.  However, on April 13, 2006, the SEC announced that it had commenced an enforcement action against Defendant El-Batrawi, along with other officers, directors, and associates of Genesis.[10]  In the complaint, the SEC charged Defendant El-Batrawi with violations of Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act in connection with a scheme to manipulate the stock price of Genesis. The SEC asserted that Defendant El-Batrawi improperly raised approximately $130 million through lending Genesis shares, rather than selling them, and charged him with systematically engaging in fraudulent and deceptive practices that had the effect of generating additional cash proceeds from broker-dealers that had participated in certain stock loan transactions.  Moreover, the SEC complaint detailed that Defendant El-Batrawi was secretly compensating a well-known financial commentator to tout Genesis on television to drum up demand for Genesis stock.

89.     Thereafter, on April 1, 2010, Defendant El-Batrawi entered into a final judgment by consent and settled the SEC's enforcement action.  Accordingly, the U.S. District Court for the Central District of California entered a consent decree against Defendant El-Batrawi, which, among other things, prohibited Defendant El-Batrawi from serving as an officer or director to a public company within five-years from April 1, 2010.  Further, on April 5, 2010, the SEC revoked the registration of each class of Genesis' securities.

---

[10] *SEC v. El-Batrawi, et al.*, Case No. 2:06-cv-02247-MRP-RZ (C.D. Cal. 2006).

90.     Although Defendant El-Batrawi served as YayYo's CEO upon the Company's inception in June 2016, the Company entered into an employment agreement with Davis a few months later on November 29, 2016 (the "Davis Employment Agreement"), at which time Davis was appointed as the Company's CEO, a role he served in until he entered into a consulting services agreement with the Company on May 2, 2017 (the "Davis Consulting Agreement") and resigned under its terms.  Since, at that time, the Company could not afford to pay Davis a market-rate salary, under the terms of the Davis Employment Agreement, Davis was entitled to purchase "100,000 shares of the Company's stock" with an exercise price at a "$1.2 [m]illion [] valuation." Further, the Davis Employment Agreement provided Davis with the option to "put 25,000 shares of stock at $8[.]00 per share for a total of $200,000.00" upon "raising a total of $5,000,000 in cumulative new capital as of November 29, 2016."  The Davis Consulting Agreement specifically contemplated the options terms and outstanding fees owed to Davis for services rendered to the Company.

91.     Upon Davis' resignation in or around May 2017, Defendant El-Batrawi served as the Company's CEO until October 4, 2018, at which point, he purportedly resigned and was appointed as Acting CEO on November 17, 2018.

92.     Prior to the IPO, the Company filed its semi-annual report on Form 1-SA with the SEC for the fiscal period ended June 30, 2017 (the "2017 Semi-Annual Report").  The 2017 Semi-Annual Report was signed by Defendant El-Batrawi.  According to the 2017 Semi-Annual Report, for the six months ended June 30, 2017, the Company suffered a net loss of 2,591,548, as compared to $52,572 for the period from inception to June 30, 2016.  Further, regarding YayYo's "Liquidity and Capital Resources," the 2017 Semi-Annual Report stated, in relevant part:

> As previously noted, we are a start-up company and ***our ability to succeed in the market will greatly depend on our ability to secure investment funding through***

*the sale of securities. We intend to use proceeds of the sale of securities to increase our market presence through key strategic alliances and technology development. Our total assets as of June 30, 2017 are $246,058 and our cash balance is $242,986. Our cash balance is not sufficient to fund our limited level of operations for any period of time. We intend to raise the funds necessary through the sales of equity and debt instrument.* From our inception we have raised approximately $3.3 million through the sale of equity securities. Recently, we created a new wholly owned subsidiary, Distinct Cars, LLC, and began leasing cars to Uber and Lyft drivers. Distinct Cars has issued notes payable for approximately $221,000 that was used as a down payment for the vehicles that are being leased to the drivers. In addition, in conjunction with the notes payable, we issued to the note holder one shares of our common stock for each $13.33 loaned.

(Emphasis added.)

93.     Meanwhile, as revealed in the SRAX Lawsuit filed on February 11, 2020, YayYo was racking up expenses between July 2018 and July 2019 for online advertising and marketing services performed by SRAX, which the Company could not afford to pay for.  During that time, the Company accrued approximately $426,286 in outstanding debt owed to SRAX.

94.     Desperate for cash and determined to raise capital to continue YayYo's operations, certain of the Individual Defendants, including Defendant El- Batrawi, prepared to take the Company public.  However, due to Defendant El-Batrawi's checkered past (detailed above), Nasdaq conditioned its approval of YayYo's common stock for listing on the exchange upon, among other things: (i) Defendant El-Batrawi resigning from his positions prior to the effective date of the IPO; and (ii) Defendant El-Batrawi reducing his equity ownership interest of the Company to less than 10% prior to the effective date of the IPO.  Accordingly, Defendant El-Batrawi purportedly stepped down from his position as Acting CEO upon the appointment of Defendant Rosen as CEO on February 1, 2019,[11] and resigned as a Company director on or about

---

[11] The 2019 10-K explains that the Company initially entered into an oral agreement with Defendant Rosen which was recorded in an Executive Employment Agreement on January 10, 2020.  Just over two weeks later, Defendant Rosen resigned from his position as CEO on January 26, 2020.

September 19, 2019.[12]  Moreover, Defendant El-Batrawi, purportedly agreed to reduce his beneficial ownership of YayYo's common stock to 9.9%, and to give up control of his remaining voting power.

95.     Nonetheless, as revealed in the El-Batrawi Lawsuit, Defendant El-Batrawi failed to sell his shares of stock in the Company prior to the IPO and continued to hold himself out as an authorized agent of YayYo.  Specifically, after he ostensibly resigned, Defendant El-Batrawi was, on behalf of the Company, contacting competitors, suppliers, and vendors of the Company and meeting with financiers and investment firms. Further, according to the El-Batrawi Lawsuit, Defendant El-Batrawi hired a public relations firm on behalf of the Company, produced and aired commercials for the Company on *Fox Business Channel*, attempted to hire two marketing firms for the Company, and dictated certain changes to the Company's website.

96.     Further, as revealed in the FirstFire Lawsuit, Defendant El-Batrawi continued to exercise supervision, authority, and control over the IPO and was intimately involved, on a daily basis, with the Company's decision-making, particularly related to the IPO.  For example, Defendant El-Batrawi fabricated an indication of interest valued at about $1.2 million in order to meet Nasdaq's closing requirements.  Moreover, according to the FirstFire Lawsuit, Defendant El-Batrawi sought to "sweeten the attraction of such further investment to major shareholders by agreeing that, if the existing creditors and/or investors provided further funding to 'close' the

---

[12] Defendant El-Batrawi also acknowledged the termination of his consulting agreement with the Company, effective September 1, 2019.  Further, on September 26, 2019, Defendant El-Batrawi executed a certification that he "resigned from the Company's Board of Directors and resigned from any and all positions with the Company and any of its subsidiaries" and, among other things, that "there will be no formal or informal affiliation between the Company and [Defendant El-Batrawi]."

Offering, the Company would 'immediately' pay back such sums to the creditors and/or shareholders from the proceeds [of the IPO]."

### *YayYo's IPO*

97.     In April 2018, the Individual Defendants began implementing steps to take the Company public. On April 30, 2018, the Company filed the Registration Statement. The Registration Statement stated that 1,500,000 shares would be registered in the IPO, at a proposed maximum offering price per share of $4.00.  Between June 7, 2018 and November 6, 2019, the Company filed fifteen amendments to the Registration Statement on Form S-1/A with the SEC. The Registration Statement was declared effective on November 12, 2019, and the Company's stock began trading publicly on the Nasdaq the next day, November 13, 2019.

98.     Subsequently, on November 14, 2019 and November 18, 2019, the Company filed with the SEC the First Prospectus and Second Prospectus, respectively. The IPO closed on November 15, 2019, and through the IPO, the Company sold 2,625,000 shares of Company stock to the public at $4 per share.  As a result of the IPO, YayYo received aggregate gross proceeds of approximately $10.5 million, before deducting underwriter costs and expenses.

### **The Individual Defendants' Duty to Disclose**

99.     SEC Regulation S-K imposes certain affirmative disclosure requirements on public companies, such as YayYo, with respect to their finances and operations. Specifically, Item 303(a)(3) of Regulation S-K required YayYo to:

> Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

100.    Additionally, Item 105 of Regulation S-K required the Individual Defendants to include in the "Risk Factors" section of the Offering Documents "a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky."

101.    As such, the Individual Defendants had a duty pursuant to Regulation S-K to disclose the fact that the Defendant El-Batrawi retained ownership, authority, and control over YayYo in violation of the Nadsaq's listing conditions, and that the Company had significant outstanding debts, as these facts constituted (i) unusual transactions or significant economic changes materially affecting the Company's reporting income, (ii) known trends or uncertainties that have had or should be reasonably expected to have a material impact on the Company's revenue or income, and (iii) significant factors that would make investing in YayYo speculative or risky.

**False and Misleading Statements**

***The Offering Documents***

102.    On April 30, 2018, before the beginning of the Relevant Period, the Company filed the Registration Statement with the SEC, in connection with the IPO.  The Registration Statement was signed by Defendants El-Batrawi, Pickard, Miglino, and Sidhu.  The Company subsequently filed fifteen amendments to the Registration Statement, and the Registration Statement was declared effective on November 12, 2019.

103.    On November 14, 2019 and November 18, 2019, shortly after the Company's stock began trading on the Nasdaq, the Company filed the First Prospectus and the Second Prospectus

with the SEC, in connection with the IPO.  The First Prospectus and Second Prospectus formed

part of and were incorporated into the Registration Statement.

104.    The Offering Documents assured investors that Defendant El-Batrawi had taken on

a diminished role with the Company and had stepped down from his positions with the Company,

stating, in relevant part:

> **On October 4, 2018, Mr. El-Batrawi resigned as Chief Executive Officer**. He then
> was appointed Acting Chief Executive Officer on November 17, 2018. **On
> February 1, 2019, Mr. El-Batrawi resigned from his position as Acting Chief
> Executive Officer of the Company** upon the appointment of Jonathan Rosen as
> Chief Executive Officer. In addition, **Mr. El-Batrawi resigned as our director
> effective as of September 1, 2019**.

(Emphasis added.)

105.    The Risk Factors section set forth in the Offering Documents, maintained that:

> We depend on a small number of executive officers and other members of
> management to work effectively as a team, to execute our business strategy and
> operating business segments, and to manage employees and consultants. **Our
> success will be dependent on the personal efforts of our Chief Executive Officer,
> our directors and such other key personnel**. Any of our officers or employees can
> terminate his or her employment relationship at any time, and the loss of the
> services of such individuals could have a material adverse effect on our business
> and prospects. **Mr. El-Batrawi, the founder and original Chairman of the Board
> and original Chief Executive Officer of the Company from its incorporation of
> the Company, resigned from all positions with the Company as a condition for
> being approved for listing on The Nasdaq Capital Market**. Our management team
> has only worked together for only a very short period of time and may not work
> well together as a management team.

(Emphasis added.)

106.    Regarding Defendant El-Batrawi's equity ownership and control of the Company,

the Offering Documents stated that:

> **As a condition to approving the Company's common stock for listing on The
> Nasdaq Capital Market, X, LLC, an entity that is wholly-owned and controlled by
> Ramy El-Batrawi, our founder and former Chief Executive Officer and former
> director, agreed to sell 12,525,000 of its 15,425,000 shares of common stock. The
> 12,525,000 shares (the "_Private Shares_") were sold** pursuant to an exemption from
> registration to four existing Company shareholders who qualify as accredited

investors (as that term is defined in Securities Act Rule 501(a)). The Private Shares were sold at $3.00 per share in exchange for non-recourse, non-interest-bearing promissory notes with maturities ranging from one year to eighteen months. *As a result of the sale, X, LLC's beneficial ownership shall be reduced to 9.9% of the shares outstanding after the completion of this Offering*. We will not receive any proceeds from the sale of the Private Shares. If the offering contemplated by this registration statement is not consummated by January 31, 2020, the parties have agreed to unwind the sale of the Private Shares transaction in compliance with applicable law. Mr. El-Batrawi has also entered into a Voting Trust Agreement (the "Trust") pursuant to which the voting power of all of his remaining 2,900,000 shares of common stock will be controlled by a trustee who will use the voting power of the common stock held in the Trust to vote on all matters presented for a vote of stockholders in the same proportion that the shares of common stock not subject to the Trust voted on such matters.

\* \* \*

*Mr. El-Batrawi has entered into a Voting Trust Agreement (the "Trust") pursuant to which the voting power of all of his outstanding common stock will be controlled by a trustee* who will use the voting power of the common stock held in the Trust to vote on all matters presented for a vote of stockholders in the same proportion that the shares of common stock not subject to the Trust voted on such matters. The Trust shall be irrevocable, and shall terminate upon the earlier of (a) the written agreement of the Company, the trustee and a duly authorized representative of Nasdaq, or (b) the date upon which the Company is not listed on a security exchange controlled by Nasdaq.

**Voting Trust**

*Mr. El-Batrawi has entered into a Voting Trust Agreement pursuant to which the voting power of all of his outstanding common stock will be controlled by a trustee who will use the voting power of the common stock held in the Trust to vote on all matters*, other than certain extraordinary matters, presented for a vote of stockholders in the same proportion that the shares of common stock not subject to the Trust voted on such matters. Mr. El-Batrawi's entrance into the Voting Trust Agreement is a condition for the Company's approval for listing on The Nasdaq Capital Market.

*The Trust shall be irrevocable*, and shall terminate upon the earlier of (a) the written agreement of the Company, the trustee and a duly authorized representative of Nasdaq, or (b) the date upon which the Company is not listed on a security exchange controlled by Nasdaq.

*The trustee, initially one of our directors, Harbant S. Sidhu, shall have discretion to vote the Trust's shares on all extraordinary matters which shall include any merger, consolidation, business combination, share exchange, restructuring,*

*recapitalization or acquisition involving the Company or any similar transaction or the sale, lease, exchange, pledge, mortgage or transfer of all or a material portion of the Company's assets*.

\* \* \*

To the best of our knowledge, except as otherwise indicated, *each of the persons named in the table has sole voting and investment power with respect to the shares of our common stock beneficially owned by such person*, except to the extent such power may be shared with a spouse. *To our knowledge, none of the shares listed below are held under a voting trust or similar agreement, except as noted. To our knowledge, there is no arrangement, including any pledge by any person of securities of the Company, the operation of which may at a subsequent date result in a change in control of the Company*.

| Name and Address of Beneficial Owner | Title | Beneficially Owned | Percent of Class Before Offering | Percent of Class After Offering |
|---|---|---|---|---|
| **Officers and Directors** [1] | | | | |
| Jonathan Rosen | Chief Executive Officer | — | — | — |
| Kevin F. Pickard [2] | Chief Financial Officer and Director | 300,000 | 1.1% | 1.0% |
| Laurie DiGiovanni | Chief Operating Officer | — | — | — |
| Jeffrey J. Guzy | Director | — | — | — |
| Christopher Miglino | Director | — | — | — |
| Harbant S. Sidhu | Director | — | — | — |
| Paul Richter | Director | — | — | — |
| **Officers and Directors as a Group (total of 7 persons)** | | **300,000** | **1.1%** | **1.0%** |
| **5% Stockholders** | | | | |
| X, LLC [3][5] | | 2,900,000 | 10.8% | 9.9% |
| Gray Mars Venus Trust, Arizona 2015 [4][5] | | 10,325,000 | 38.5% | 35.1% |
| Bellridge Capital, L.P. [5][6] | | 2,400,000 | 8.5% | 7.87% |
| David Haley [5][7] | | 2,844,945 | 10.6% | 9.7% |
| James Malackowiski [5][8] | | 2,758,824 | 10.3% | 9.4% |
| John O'Hurley [5][9] | | 2,018,750 | 7.5% | 6.9% |
| Acuitas Group Holdings, LLC [5][10] | | 1,654,412 | 6.2% | 5.6% |

(Emphasis added.)

107.    In the main Summary of the Offering section, the Offering Documents stated, regarding "Use of Proceeds," the following:

> ***We currently intend to use the net proceeds to us from this primary offering to purchase vehicles to add to our fleet of passenger vehicles made available for rent through our wholly-owned subsidiary, Distinct Cars, and for general corporate purposes, including working capital and sales and marketing activities***.

(Emphasis added.)

108.   The Use of Proceeds section of the Offering Documents reiterated the Company's intent related to the use of proceeds from the IPO, stating:

> The principal purposes of this primary offering are to increase our capitalization and financial flexibility, increase our visibility in the marketplace and create a public market for our common stock. As of the date of this prospectus, we cannot specify with certainty all of the particular uses for the net proceeds to us from this primary offering. However, ***we currently intend to use the net proceeds to us from this primary offering to add to our fleet of passenger vehicles made available for rent through the Company's wholly-owned subsidiary, Distinct Cars, and for general corporate purposes, including working capital, sales and marketing activities. We may also use a portion of the net proceeds for the acquisition of, or investment in, technologies, solutions or businesses that complement our business***, although we have no present commitments or agreements to enter into any acquisitions or investments.

(Emphasis added.)

109.   Regarding Davis, the Company's former CEO, President, and director, the Offering Documents stated that he was the "Former President, Chief Executive Officer, [and] Director," and that he was paid "$20,000" in salary for the fiscal year ended December 31, 2017.[13]

110.   In addition, the Offering Documents further stated that, [o]n December 1, 2016, … Mr. Davis … received non-qualified stock options expiring on December 31, 2018, entitling [him] to purchase 100,000 shares of Company common stock at an exercise price of $1.00 per share at any time on or after June 1, 2017[.]"

111.   The Offering Documents also stated, as to Davis, the following:

---

[13] Regarding Davis' compensation, the Offering Documents further provided that, "Executive compensation in the amount of $10,000 payable for each of the months of January and February 2017."

On November 29, 2016, the Company and Mr. Davis, a former executive officer of the Company, entered into an offer of employment agreement with the Company setting forth an initial base salary for Mr. Davis's first three months of service and performance under his term of employment with the Company. As set forth under the employment offer, Mr. Davis was entitled to receive (i) $15,000 for his service in the month of December 2016, (ii) $10,000 for service performed during the month of January, 2017 and an additional $10,000 for service performed by Mr. Davis during the month of February 2017.

112.     In the Certain Relationships and Related Party Transactions section, the Offering Documents talked down YayYo's outstanding contractual obligation due to SRAX.  The Offering Documents stated the following, in relevant part:

> ***During the year ended December 31, 2018, the Company incurred $334,471 for advertising and digital media services from Social Reality, Inc***. The advertising fees for the year ended December 31, 2018, were less than 5% of Social Reality, Inc.'s consolidated gross revenues. One of our directors, Christopher Miglino, is the Chief Executive Officer of Social Reality, Inc. and owns approximately 7.5% of Social Reality Inc.'s stock. ***At December 31, 2018, the Company had an amount due of $334,471 to Social Reality, Inc***. The transactions with Social Reality, Inc. were arm's length transactions in the ordinary course of business upon terms no less favorable than the Company could obtain from third parties.

(Emphasis added.)

113.     The statements referenced above in ¶¶97-107 were materially false and misleading because they failed to disclose, *inter alia*, that: (1) in violation of the listing conditions imposed by the Nasdaq, Defendant El-Batrawi failed to discontinue his supervision, authority, and control over the Company, and was closely involved on a daily basis with YayYo's business, operations and finances, including contributing to the marketing of YayYo's IPO; (2) in further violation of the listing conditions imposed by the Nasdaq, Defendant El-Batrawi did not properly divest himself of the 12,525,000 "Private Shares" of Company stock he owned, and continued to hold a controlling interest in the Company; (3) to meet the Nasdaq's minimum listing requirements, the Individual Defendants pledged that in exchange for certain of the Company's creditors agreeing to purchase shares in the IPO, the Company would repurchase those shares with the proceeds the

Company received from the IPO; (4) the Company owed Davis approximately $454,086 at the time of the IPO; (5) the Company owed SRAX approximately $426,286 in unpaid media services, most of which was over one year past due; and (6) as a result, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### March 31, 2020 Form 10-K

114.    On March 31, 2020, after successfully completing its IPO, the Company filed the 2019 10-K. The 2019 10-K was signed by Defendants El-Batrawi, Pickard, Mox, O'Neill, Sanchez, and Sidhu, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants El-Batrawi and Pickard attesting to the accuracy of the 2019 10-K.

115.    Like the Offering Documents, the 2019 10-K also maintained that Defendant El-Batrawi stepped down from his positions at the Company, stating in relevant part:

> **On October 4, 2018, Mr. El-Batrawi resigned as Chief Executive Officer**. He then was appointed Acting Chief Executive Officer on November 17, 2018. **On February 1, 2019, Mr. El-Batrawi resigned from his position as Acting Chief Executive Officer of the Company** upon the appointment of Jonathan Rosen as Chief Executive Officer. In addition, **Mr. El-Batrawi resigned as our director effective as of September 1, 2019**. Mr. El-Batrawi was reappointed as our Chief Executive Officer and a director in February 2020.

(Emphasis added.)

116.    The 2019 10-K also described YayYo's risk factors pertaining to its management team, stating:

> We depend on a small number of executive officers and other members of management to work effectively as a team, to execute our business strategy and operating business segments, and to manage employees and consultants. **Our success will be dependent on the personal efforts of our Chief Executive Officer, our directors and such other key personnel**. Any of our officers or employees can terminate his or her employment relationship at any time, and the loss of the

services of such individuals could have a material adverse effect on our business and prospects. ***Ramy El-Batrawi, our founder and original Chairman of the Board and original Chief Executive Officer of the Company from its incorporation of the Company, resigned from all positions with the Company as a condition for being approved for listing on The Nasdaq Capital Market***. After our delisting from Nasdaq, Mr. El-Batrawi was reappointed as our Chief Executive Officer and a director, and our former Chief Executive Officer, Jonathan Rosen, and our former President, Boyd Bishop, resigned. Our management team has only worked together for only a very short period of time and may not work well together as a management team.

(Emphasis added.)

117.    Regarding Defendant El-Batrawi's equity ownership and control of the Company, the 2019 10-K, similarly to the Offering Documents, provided that:

> ***As a condition to approving the Company's common stock for listing on The Nasdaq Capital Market, X, LLC, agreed to sell 12,525,000 of its 15,445,000 shares of the Company's common stock. The 12,525,000 shares (the "Private Shares") were sold*** pursuant to an exemption from registration under the Securities Act to four existing Company shareholders who qualify as accredited investors (as that term is defined in Securities Act Rule 501(a)). The Private Shares were sold at $3.00 per share in exchange for non-recourse, non-interest-bearing promissory notes with maturities ranging from one year to eighteen months. X, LLC transferred all rights of ownership to the purchasers. The purchasers shall be entitled to receive all dividends and distributions, shall have the power to exercise all voting rights and may sell or pledge the Private Shares. The Private Shares, however, shall not be electronically transferred to the purchasers' account until the pricing of this public offering.

* * *

> ***As a condition to our listing on Nasdaq,(i) Ramy El-Batrawi, our founder and original Chairman of the Board and original Chief Executive Officer, resigned from all positions with the Company, (ii) X, LLC, an entity that is wholly-owned and controlled by Mr. El-Batrawi, agreed to sell 12,525,000 of its 15,445,000 shares of common stock, reducing, X, LLC's beneficial ownership to 9.9% of our common stock then outstanding***, and (iii) Mr. El-Batrawi entered into a Voting Trust Agreement (the "Trust") pursuant to which the voting power of all of his outstanding common stock was controlled by a trustee who was required to use the voting power of the common stock held in the Trust to vote on all matters presented for a vote of stockholders in the same proportion that the shares of common stock not subject to the Trust voted on such matters.

* * *

*Mr. El-Batrawi has entered into a Voting Trust Agreement (the "Trust") pursuant to which the voting power of all of his outstanding common stock will be controlled by a trustee* who will use the voting power of the common stock held in the Trust to vote on all matters presented for a vote of stockholders in the same proportion that the shares of common stock not subject to the Trust voted on such matters.

\* \* \*

| Name and Address of Beneficial Owner | Title | Beneficially Owned | Percent of Class |
|---|---|---|---|
| Officers and Directors [(1)] | | | |
| Ramy El-Batrawi [(3) (5)] | Chief Executive Officer | 2,900,000 | 9.9% |
| Kevin F. Pickard [(2)] | Chief Financial Officer and Director | 300,000 | 1.0% |
| Laurie DiGiovanni | Chief Operating Officer | — | — |
| Stephen M. Sanchez | Director | 1,014 | * |
| Douglas M. Mox | Director | — | — |
| Harbant S. Sidhu | Director | — | — |
| John P. O'Neill | Director | — | — |
| Officers and Directors as a Group (total of 7 persons) | | 3,201,104 | 10.8% |
| 5% Stockholders | | | |
| Gray Mars Venus Trust, Arizona 2015 [(4) (5)] | | 10,325,000 | 35.1% |
| Bellridge Capital, L.P. [(5) (6)] | | 2,126,980 | 6.9% |
| David Haley [(5) (7)] | | 788,191 | 2.7% |
| James Malackowiski [(5) (8)] | | 2,758,824 | 9.4% |
| John O'Hurley [(5) (9)] | | 1,018,750 | 3.5% |
| Acuitas Group Holdings, LLC [(5) (10)] | | 1,654,412 | 5.6% |

\* Less than 1%

(Emphasis added.)

118.    In regard to the use of proceeds from the IPO, the 2019 10-K stated, in relevant part:

**Use of Proceeds**

Our Registration Statement on Form S-1, SEC file number 333-224549, was declared effective by the SEC on November 12, 2019, pursuant to which we offered for sale to the public (i) by us in an underwritten public offering, 2,625,000 newly issued shares of our common stock at an offering price of $4.00 per share, for total gross proceeds to us of $10,500,000, before deducting underwriting discounts and commissions and other offering expenses, and (ii) by a selling stockholder, up to (a) 150,000 outstanding shares of common stock, and (b) 1,500,000 shares of common stock issuable upon exercise of common stock purchase warrants, from

40

time to time at market prices prevailing at the time of sale or at negotiated prices, from which we have not received and will not receive any proceeds.

The sale of 2,625,000 shares by us was completed on November 15, 2019. Aegis Capital Corp. and WestPark Capital, Inc., were the underwriters.

We incurred expenses in connection with the issuance and distribution of the shares registered of $840,000 for underwriting discounts and commissions, $105,000 for expenses of the underwriters and $125,000 for other expenses, for total offering expenses of $1,070,000. Such payments were not direct or indirect payments to our directors, officers or their associates, to persons owning 10% percent or more of our common stock, or to any of our affiliates.

The net offering proceeds to us after deducting the total expenses described above were $9,430,000. Such net proceeds were applies as follows:

| | | |
|---|---|---|
| Repayment of notes payable and accrued interest | $ | 3,515,520 |
| Working capital | | 2,793,962 |
| Director and officer insurance premiums and escrow account | | 922,400 |
| Vehicles | | 664,158 |
| Vehicle insurance | | 622,323 |
| Professional fees | | 534,363 |
| Advertising and media | | 377,274 |

Such payments were not direct or indirect payments to our directors, officers or their associates, to persons owning 10% percent or more of our common stock, or to any of our affiliates.

119.    Like the Offering Documents, the 2019 10-K downplayed the debt YayYo owed to

SRAX, stating the following, in relevant part:

> ***During the year ended December 31, 2018, the Company incurred $334,471 for advertising and digital media services from Social Reality, Inc***. The advertising fees for the year ended December 31, 2018, were less than 5% of Social Reality, Inc.'s consolidated gross revenues. One of our former directors, Christopher Miglino, is the Chief Executive Officer of Social Reality, Inc. and owns approximately 7.5% of Social Reality Inc.'s stock. ***At December 31, 2018, the Company had an amount due of $334,471 to Social Reality, Inc***. The transactions with Social Reality, Inc. were arm's length transactions in the ordinary course of business upon terms no less favorable than the Company could obtain from third parties.

(Emphasis added.)

120.     The statements referenced above in ¶¶109-114 were materially false and misleading because they failed to disclose, *inter alia*, that: (1) in violation of the listing conditions imposed by the Nasdaq, Defendant El-Batrawi failed to discontinue his supervision, authority, and control over the Company, and was closely involved on a daily basis with YayYo's business, operations and finances, including contributing to the marketing of YayYo's IPO; (2) in further violation of the listing conditions imposed by the Nasdaq, Defendant El-Batrawi did not properly divest himself of the 12,525,000 "Private Shares" of Company stock he owned, and continued to hold a controlling interest in the Company; (3) the Company owed SRAX approximately $426,286 in unpaid media services, most of which was over one year past due; and (4) as a result, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### The Truth Gradually Emerges

121.     On January 13, 2020, the Company filed a current report with the SEC on Form 8-K disclosing that YayYo had entered into an executive employment agreement with the Company's then-CEO, Defendant Rosen, pursuant to which Defendant Rosen would "continue to serve as the Company's [CEO] for one year or until terminated in accordance with the Agreement."

122.     Just over a week later, on January 24, 2020, the Company commenced the El-Batrawi Lawsuit, alleging, in relevant part:

> *Despite leaving the Company following concerns from NASDAQ regarding his involvement in the day-to-day operations of YayYo in September 2019, Defendant [El-Batrawi] has engaged in a continuous course of actions misrepresenting himself as affiliated with, speaking on behalf of, and authorized or empowered by YayYo. In so doing, Defendant [El-Batrawi] has purported to bind the Company to contracts, direct its employees, change its website, and event to attempted to sell the Company to its competitors.*

(Emphasis added.)

123.    According to the declaration of Defendant Rosen that was filed with the Company's complaint in support of a temporary restraining order, although Defendant El-Batrawi pledged to have "***no formal or informal affiliation between the Company and [El-Batrawi]***, expect [sic] for [his] minority ownership (less than 10%) in the Company"[14] Defendant El-Batrawi "continue[d] to operate and hold himself out as if a director or officer of YayYo, or as an otherwise authorized representative of the same."

124.    Defendant Rosen's declaration further averred that "Defendant El-Batrawi ha[d] failed and/or refused to sell his shares of stock in the Company" in contradiction to the Offering Documents' express proclamation that Defendant El-Batrawi had already sold 12,525,000 shares he had owned of YayYo prior to the IPO.

125.    Defendant Rosen also testified that "[s]ince [September 2019], Defendant El-Batrawi has engaged in a continuous and escalating pattern of behavior destructive to YayYo…" including, among other things, holding himself out as a representative of YayYo while contacting competitors, suppliers, and vendors of the Company to negotiate with them, and meeting with financiers and investment firms regarding the Company.  Defendant Rosen's declaration further stated that Defendant El-Batrawi hired a public relations firm on behalf of the Company, produced and aired commercials for the Company on *Fox Business Channel*, attempted to hire two marketing firms for the Company, and dictated that certain changes be made to the Company's website.

126.    On January 27, 2020, the Company filed a current report with the SEC on Form 8-K announcing that Defendants Guzy, Miglino, and Richter had been removed from the Board and replaced with Defendants Mox, O'Neill, and Sanchez.  Further, the Company announced that Defendant Rosen resigned from his position as CEO.  The 8-K stated, in relevant part:

---

[14] Emphasis in original.

By the written consent of the holders of more than a majority of the shares of YayYo, Inc. (the "Company") then entitled to vote at an election of directors, Messrs. ***Jeffrey J. Guzy, Christopher Miglino and Paul Richter were removed as directors of the Company, effective January 22, 2020***. ***On January 24, 2020, the remaining directors of the Company elected Douglas M. Mox, John P. O'Neill and Stephen M. Sanchez as directors to fill such vacancies***, each to hold office until the earlier of the expiration of the term of office of the director whom he has replaced, a successor is duly elected and qualified or the earlier of such director's death, resignation, disqualification or removal. Stephen M. Sanchez was elected as the Chairman of the Board of Directors (the "Board").

***

In addition to the above, ***on January 26, 2020, Jonathan Rosen resigned from his position as the Company's Chief Executive Officer. Mr. Rosen informed the Board that his resignation was for "Good Reason,"*** as that term is defined in Mr. Rosen's employment agreement with the Company dated January 10, 2020. The Company disagrees with Mr. Rosen's characterization of the circumstances surrounding his resignation and does not believe that "Good Reason" exists for Mr. Rosen's resignation.

(Emphasis added.)

127. Shortly thereafter, on February 10, 2020, the Company issued the February 2020 Press Release, which announced that the Board had purportedly elected to voluntarily delist from the Nasdaq. The press release stated, in relevant part:

BEVERLY HILLS, Calif., Feb. 10, 2020 (GLOBE NEWSWIRE) -- YayYo, Inc. (NASDAQ:YAYO) (the "Company" or "YayYo") today ***announced its intention to voluntarily delist its common stock from the NASDAQ Stock Market ("NASDAQ")*** effective on February 20, 2020. The Company expects that its common stock will be approved for quotation on the OTCQB from and after that date. The Company has elected to effect the voluntary delisting of its common stock after discussions with NASDAQ's staff and based on the determination of the Company's board of directors that voluntarily delisting the common stock from the NASDAQ is in the best interests of the Company and its stockholders. ***NASDAQ has advised the Company that it believes that the Company has failed the conditions for continued listing of its common stock set forth in Listing Rule 5250(a). The voluntary delisting will permit the Company to operate its business free from restrictions imposed by NASDAQ rules and the conditions applicable to the listing of the Company's common stock on the NASDAQ***.

The Company has notified NASDAQ of its intent to voluntarily delist its common stock from the NASDAQ. The Company currently anticipates that it will ale with

the Securities and Exchange Commission a Form 25 relating to the delisting of its common stock on or about February 20, 2020 and expects the delisting of its common stock to be effective ten days thereafter. The purpose of the Form 25 relating is to effect the voluntary delisting from the NASDAQ of the Company's outstanding common stock. The Company does not expect the delisting to have any adverse effects on its business operations.

(Emphasis added.)

128.    The next day, on February 11, 2020, SRAX commenced the SRAX Lawsuit. SRAX's complaint claimed that the Company owed it $645,286—including $426,286 for services rendered prior to the IPO.  Further, SRAX alleged that the Company claimed to be "unable to pay" the debt it owed to SRAX for the media services prior to the IPO "apparently due to a delay in its [IPO]."

129.    Not only did SRAX's complaint annex invoices signed by Defendant El-Batrawi, but SRAX also annexed, among other things, an email from Defendant Rosen dated January 24, 2020, which made clear that YayYo had paid "just over [$50,000]" to SRAX the previous day, January 23, 2020, and that it had to rely on additional "outside financing" to repay SRAX the outstanding amount due.

130.    On March 3, 2020, the Company filed the March 2020 8-K, announcing that:

*On February 28, 2020, the Board of Directors (the "Board") of YayYo Inc. (the "Company") appointed Ramy El-Batrawi as the Company's Chief Executive Officer and as a member of the Board, effective immediately*. Mr. El-Batrawi has not been appointed to serve on any committees of the Board at this time and will receive no compensation in connection with his appointment as Chief Executive Officer or his service on the Board.

Mr. El-Batrawi, 58, is a founder of the Company and previously served as its Chief Executive Officer from June 2016 until February 2019 and as a director from June 2016 until September 2019. Mr. El-Batrawi is the founder and sole owner of PDQ Pickup LLC, a moving and logistics company, which he founded in December 2018. Since May 2015, he has been the owner of X, LLC, a private investment firm. Prior thereto, Mr. El-Batrawi was the owner and chief executive officer of Growth Strategy Investments, LLC, a private investment firm.

There are no family relationships, as defined in Item 401 of Regulation S-K, between Mr. El-Batrawi and any of the Company's executive officers or directors or persons nominated or chosen to become a director or executive officer. ***There is no arrangement or understanding between Mr. El-Batrawi and any other person pursuant to which Mr. El-Batrawi was appointed as Chief Executive Officer***.

During the year ended December 31, 2018, the Company paid management fees of $205,000, to a company that is owned by Mr. El-Batrawi. Beginning on February 1, 2019, the Company entered into a consulting agreement with Mr. El-Batrawi and paid $167,000 under the consulting agreement. The consulting agreement was terminated effective September 1, 2019.

(Emphasis added.)

131.    Two days later, on March 5, 2020, Davis commenced the Davis Lawsuit, seeking damages and declaratory relief for failure to pay wages in violation of labor code 201, et. Seq., violation of California's Unfair Competition Laws (Business & Professions Code 17200, et seq.), breach of contract, intentional misrepresentation and fraud, and promissory fraud.[15] The complaint asserted, in relevant part:

Plaintiff Anthony Davis is an experienced, c-suite level executive that agreed to join Yayyo [sic], a ridesharing startup company, as its CEO, for a salary well below his market rate in exchange for the written promise of stock options made by Yayyo founder and then CEO Ramy El-Batrawi.

After only five (5) months of service and in accordance with his responsibilities under an employment agreement, Plaintiff determined that Ramy El-Batrawi could not be trusted because he regularly ignored legal counsel regarding SEC matters and flouted Board protocols and industry norms for corporate compliance. Specifically, El-Batrawi filed fraudulent and materially misleading documents with the SEC that Yayyo continues to use to deny Plaintiff the compensation he is owed.

Instead of remaining in an untenable position due to El-Batrawi's illegal and fraudulent conduct, Plaintiff negotiated a separation written agreement through a consulting agreement that described the agreed upon compensation owed to Plaintiff, including specific language regarding payment from the stock options and other cash owed. To date, despite numerous good faith attempts to be paid pursuant to the written agreements, Yayyo refuses to honor its obligations thereunder.

---

[15] *Davis. v. YayYo, Inc.*, Case No. 20STCV09143 (Super. Ct. Los Angeles County), filed March 5, 2020.

> Based on the written agreements, Yayyo and El-Batrawi caused damages to Davis in the amount of at least **$454,086.39** for losses related to cash compensation, expenses and the stock options value, plus attorney's fees and costs. Plaintiff also seeks injunctive relief requiring Yayyo to amend the SEC filings (Form S-1/A) so as to not mislead the public.

(Emphasis in original.)

132.    On April 13, 2020, YayYo filed the April 2020 8-K, announcing that:

> ***On April 2, 2020, X, LLC, a company wholly-owned and controlled by Ramy El-Batrawi, the Chief Executive Officer and a Director of YayYo, Inc. (the "Company"), loaned $50,000 to the Company, and on April 6, 2020, X, LLC, loaned an additional $100,000 to the Company***. These loans were made under an oral agreement, are secured by all of the assets of the Company and its subsidiaries, bear no interest, and are payable 30 days after the date of the loan. The Company will use the proceeds of these loans for general working capital purposes.

(Emphasis added.)

133.    Just over two weeks later, on April 28, 2020, FirstFire commenced the FirstFire Lawsuit against the Underwriters, seeking damages and alleging, among other things, that the Offering Documents were materially false and misleading since they omitted that Defendant El-Batrawi had maintained continuous control over YayYo leading up to the IPO.  In addition, FirstFire's complaint detailed that Defendant El-Batrawi feigned a $1.2 million commitment purportedly from a trust, which wound up being a falsehood, when the Underwriters were unable to raise $10 million, the minimum amount required by Nasdaq to close the IPO.  Further, the FirstFire Lawsuit revealed that Defendant El-Batrawi and the Underwriters attempted to attract funding by agreeing to "immediately" pay investors back with certain of the proceeds the Company received from the IPO, an "unlawful act" that "materially misrepresented the Offering and fraudulently mislead investors[.]"  Additionally, the FirstFire complaint charges that the Underwriters represented to investors that the Company intended to use the proceeds from the IPO to buy vehicles to add to its fleet and for general corporate purposes, even though the Company planned to use the proceeds for other purposes.

134.    On the foregoing disclosures, the price of the Company's stock fell approximately 97.5%, or $3.90, tumbling from $4.00 per share at the time of the IPO to $0.10 per share at the close of trading on April 28, 2020.

135.    Still, nearly six months after the truth emerged, the Company has yet to regain its business standing. The Company's stock is currently trading at a meager $0.23 per share, representing a staggering 94.25% drop from the time of the IPO.

### DAMAGES TO YAYYO

136.    As a direct and proximate result of the Individual Defendants' conduct, YayYo will lose and expend many millions of dollars.

137.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against, among others, the Company and certain of the Individual Defendants, and any internal investigations and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

138.    Further, these expenditures include, but are not limited to, legal fees associated with the El-Batrawi Lawsuit that the Company was forced to file against Defendant El-Batrawi, and any amounts paid to outside lawyers, accountants, and investigators in connection thereto.

139.    Further, these expenditures include, but are not limited to, legal fees associated with the Davis Lawsuit and the SRAX Lawsuit filed against, among others, the Company and certain of the Individual Defendants, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

140.    Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to certain of the Individual Defendants who breached their fiduciary duties to the Company.

141.    As a direct and proximate result of the Individual Defendants' conduct, YayYo has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

142.    Plaintiff brings this action derivatively and for the benefit of YayYo to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of YayYo, gross mismanagement, abuse of control, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof.

143.    YayYo is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

144.    Plaintiff is, and has been since before the IPO, a shareholder of YayYo.  Plaintiff will adequately and fairly represent the interests of YayYo in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

145.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

146.    A pre-suit demand on the Board of YayYo is futile and, therefore, excused.  At the time of filing of this action, the Board consists of the following five individuals: Defendants El-Batrawi, Mox, O'Neill, Sanchez, and Sidhu (the "Directors").  Plaintiff needs only to allege

demand futility as to three of the five directors who are on the Board at the time this action is commenced.

147.   Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

148.   Two the Directors served as Company directors prior to the Relevant Period and the IPO, and all of the Directors served as Company directors throughout the Relevant Period. In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in causing the Company to make the materially false and misleading statements alleged herein.  The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors.  As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

149.   Additional reasons that demand on Defendant El-Batrawi is futile follow. Defendant El-Batrawi is the founder of YayYo, and has served as YayYo's CEO and as a Company director since February 28, 2020. He previously served as CEO from the Company's inception until about November 2016, and again from about May 2017 until he resigned on October 4, 2018. Defendant El-Batrawi also served as Acting CEO from November 17, 2018 until he purportedly resigned on February 1, 2019.  He also previously served as a Company director from June 2016 until his purported resignation in September 2019.  The Company provides Defendant El-Batrawi

with his principal occupation, and he receives handsome compensation, including $167,000 for the fiscal year ended December 31, 2019 and $205,000 for the fiscal year ended December 31, 2018. Defendant El-Batrawi is also the founder of X, LLC, a company he wholly owns and controls, which has provided the Company with a loan of approximately $150,000, secured by all of the Company's assets according to an oral agreement. As the Company provides Defendant El-Batrawi with his primary occupation and means of livelihood, it is unlikely he would entertain a demand against the remaining current directors on the Board, who are responsible for, *inter alia*, determining his compensation and evaluating his continued employment with YayYo. As the Company's highest officer, he conducted little, if any, oversight of the scheme to make and to cause the Company to make false and misleading statements and to fail to correct them, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant El-Batrawi signed, and thus personally made the false and misleading statements in the Registration Statement and 2019 10-K. Moreover, Defendant El-Batrawi is a defendant in the Securities Class Actions and the El-Batrawi Lawsuit. For these reasons, Defendant El-Batrawi breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

150.    Additional reasons that demand on Defendant Mox is futile follow. Defendant Mox has served as a Company director January 2020. He also serves as the Chairman of the Audit Committee. As a trusted Company director, he conducted little, if any, oversight of the scheme to make and to cause the Company to make false and misleading statements and to fail to correct them, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore,

Defendant Mox signed, and thus personally made the false and misleading statements in the 2019 10-K. For these reasons, Defendant Mox breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

151. Additional reasons that demand on Defendant O'Neill is futile follow. Defendant O'Neill has served as a Company director since January 2020. He also serves as a member of the Audit Committee. As a trusted Company director, he conducted little, if any, oversight of the scheme to make and to cause the Company to make false and misleading statements and to fail to correct them, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant O'Neill signed, and thus personally made the false and misleading statements in the 2019 10-K. For these reasons, Defendant O'Neill breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

152. Additional reasons that demand on Defendant Sanchez is futile follow. Defendant Sanchez has served as a Company director since January 2020. He also serves as Chairman of the Compensation Committee. As a trusted Company director, he conducted little, if any, oversight of the scheme to make and to cause the Company to make false and misleading statements and to fail to correct them, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Sanchez signed, and thus personally made the false and misleading statements in the 2019 10-K. For these reasons, Defendant Sanchez breached his fiduciary duties,

faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

153.    Additional reasons that demand on Defendant Sidhu is futile follow.  Defendant Sidhu has served as a Company director since October 2017.  He also serves as a member of the Compensation Committee.  He previously served as a member of the Audit Committee.  As a trusted Company director, he conducted little, if any, oversight of the scheme to make and to cause the Company to make false and misleading statements and to fail to correct them, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Sidhu signed, and thus personally made the false and misleading statements in the Registration Statement and 2019 10-K.  Moreover, Defendant Sidhu is a defendant in the Securities Class Actions.  For these reasons, Defendant Sidhu breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon his is futile and, therefore, excused.

154.    Additional reasons that demand on the Board is futile follow.

155.    Defendants Mox, O'Neill, and Sidhu (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period.  Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, "(a) the integrity of the Company's financial statements, the Company's accounting and financial reporting processes and financial statement audits, (b) the Company's compliance with legal and regulatory requirements, [and] (c) the Company's systems of internal control over financial reporting and disclosure controls and procedures[.]"  The Audit Committee Defendants were also responsible for reviewing and discussing with management the Company's disclosures

in its periodic reports with the SEC and earnings press releases.  The Audit Committee Defendants failed to ensure the integrity of the Company's accounting and financial reporting processes and internal controls, as they are charged to do under the Audit Committee Charter, allowing the Company to issue false and misleading statements with the SEC.  Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

156.    The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders.  For instance, Defendants Mox, O'Neill, and Sanchez all worked at DHL International GmbH, or its affiliate, prior to 2014 and prior to joining the Board on January 24, 2020.  Additionally, Defendants Mox and Sanchez both worked at United Parcel Service prior to joining the Board on January 24, 2020.  These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.  Thus, demand upon the Directors would be futile.

157.    In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to make and cause the Company to make, and to fail to correct, materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, and unjust enrichment.  In violation of the Code of Conduct, the Directors failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, protect and properly use corporate assets, and

properly report violations of the Code of Conduct.  Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

158.    YayYo has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for YayYo any part of the damages YayYo suffered and will continue to suffer thereby.  Thus, any demand upon the Directors would be futile.

159.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's bylaws.  As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

160.    The acts complained of herein constitute violations of fiduciary duties owed by YayYo's officers and directors, and these acts are incapable of ratification.

161.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of YayYo.  If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-

versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of YayYo, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

162. If there is no directors' and officers' liability insurance, then the Directors will not cause YayYo to sue the Individual Defendants named herein, because, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

163. Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least three of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants Breach of Fiduciary Duties

164. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

165. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of YayYo's business and affairs.

166. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

167. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of YayYo.

168.   In breach of their fiduciary duties owed to YayYo, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements of material fact that failed to disclose that: (1) in violation of the listing conditions imposed by the Nasdaq, Defendant El-Batrawi failed to discontinue his supervision, authority, and control over the Company, and was closely involved on a daily basis with YayYo's business, operations and finances, including contributing to the marketing of YayYo's IPO; (2) in further violation of the listing conditions imposed by the Nasdaq, Defendant El-Batrawi did not properly divest himself of the 12,525,000 "Private Shares" of Company stock he owned, and continued to hold a controlling interest in the Company; (3) to meet the Nasdaq's minimum listing requirements, the Individual Defendants pledged that in exchange for certain of the Company's creditors agreeing to purchase shares in the IPO, the Company would repurchase those shares with the proceeds the Company received from the IPO; (4) the Company owed Davis approximately $454,086 at the time of the IPO; (5) the Company owed SRAX approximately $426,286 in unpaid media services, most of which was over one year past due; and (6) as a result, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

169.   The Individual Defendants further failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact.

170.   Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

171.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the

misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of YayYo's securities.

172.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of YayYo's securities.

173.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

174.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, YayYo has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

175.    Plaintiff on behalf of YayYo has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Unjust Enrichment

176.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

177. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, YayYo.

178. The Individual Defendants benefitted financially from the improper conduct, including through receipt of bonuses, stock options, or similar compensation from YayYo that was tied to the performance or artificially inflated valuation of YayYo, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

179. Plaintiff, as a shareholder and a representative of YayYo, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

180. Plaintiff on behalf of YayYo has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Abuse of Control

181. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

182. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence YayYo, for which they are legally responsible.

183. As a direct and proximate result of the Individual Defendants' abuse of control, YayYo has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, YayYo has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

184.    Plaintiff on behalf of YayYo has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

185.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

186.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of YayYo in a manner consistent with the operations of a publicly-held corporation.

187.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, YayYo has sustained and will continue to sustain significant damages.

188.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

189.    Plaintiff on behalf of YayYo has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

190.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

191.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused YayYo to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions and to lose financing from investors and business from future customers who no longer trust the Company and its products.

192.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

193.    Plaintiff on behalf of YayYo has no adequate remedy at law.

### SIXTH CLAIM

**Against the Individual Defendants for Contribution
Under Section 11(f) of the Securities Act and Section 21D of the Exchange Act**

194.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

195.    As a result of the conduct and events alleged above, the Company has been named as a defendant in the Securities Class Actions brought on behalf of YayYo shareholders in which it is a joint tortfeasor in claims brought under Sections 11, 12(a)(2), and 15 of the Securities Act.

196.    Federal law provides YayYo with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

197.    The plaintiffs in the Securities Class Actions allege that the Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

198.    YayYo is the registrant for the IPO.   The Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

199.    As issuer of the shares, YayYo is strictly liable to plaintiffs and the class for the misstatements and omissions alleged in the Securities Class Actions.

200.    The plaintiffs in the Securities Class Actions allege that none of the Individual Defendants named therein made a reasonable investigation or possessed reasonable grounds for

the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

201.    The Individual Defendants, because of their positions of control and authority as officers and directors of YayYo, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of YayYo, including the wrongful acts complained of herein and in the Securities Class Actions.

202.    Accordingly, the Individual Defendants are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Securities Act.

203.    As such, YayYo is entitled to receive all appropriate contribution or indemnification from the Individual Defendants.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of YayYo, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to YayYo;

(c)    Determining and awarding to YayYo the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing YayYo and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with

applicable laws and to protect YayYo and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

      1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

      2.  a provision to permit the shareholders of YayYo to nominate at least three candidates for election to the Board; and

      3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

     (e)     Awarding YayYo restitution from the Individual Defendants, and each of them;

     (f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

     (g)     Granting such other and further relief as the Court may deem just and proper.

Dated: October 12, 2020             Respectfully submitted,

                           **FARNAN LLP**

                           /s/ Michael J. Farnan
                           Brian E. Farnan (Bar No. 4089)
                           Michael J. Farnan (Bar No. 5165)
                           919 N. Market St., 12th Floor
                           Wilmington, DE 19801
                           Telephone: (302) 777-0300
                           Facsimile: (302) 777-0301
                           Email: bfarnan@farnanlaw.com

mfarnan@farnanlaw.com

Of Counsel:

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net